Affirmed and Memorandum Opinion filed May 12, 2011.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-09-00838-CV

___________________

 

Davis Gulf Coast, Inc., Appellant

 

V.

 

Smith International, Inc.,
Appellee



 



 

On
Appeal from the 165th District Court

Harris County,
Texas



Trial Court Cause No. 2006-01502

 



 

 

MEMORANDUM OPINION

Appellant, Davis Gulf Coast, Inc., appeals from a
judgment entered in favor of appellee, Smith International, Inc., following a
jury trial.  We affirm the trial court’s judgment.

Factual and Procedural Background

Appellant develops oil and gas drilling prospects,
locates investors to finance drilling operations, and oversees day-to-day drilling
operations.  Appellee is an oil field services company.

On July 3, 2003, appellant and appellee executed
appellant’s Master Services Agreement (“MSA”) to govern any work appellee might
perform for appellant.  The provisions of the MSA directly involved in this
appeal include paragraphs 1, 2, 11, 17, and 20 which provide as follows:

1.         APPLICATION; TERMINATION.  This Agreement shall
control and govern all work performed by [appellee] for [appellant] (the
“Work”).  In the event of any conflict between this Agreement and any oral or
written work order issued by [appellant], this Agreement shall control….

2.         CONDUCT OF WORK.  Upon [appellant] notifying
[appellee] of Work to be performed, [appellee] shall undertake the performance
of the Work with proper equipment and fully trained personnel and thereafter
shall continue with due diligence and in a good and workmanlike manner to its
completion….

11.       CHARGES; PAYMENT.  The consideration to be paid
by [appellant] to [appellee] shall be the amount agreed upon by [appellant] and
[appellee] prior to commencement of the Work; provided, however, that the
amount to be paid for the Work shall not exceed [appellee’s] usual and
customary charge for similar and the same scope of work in the locality where
the Work is to be performed….

17.       WORK ORDERS.  This Agreement does not obligate
[appellant] to order Work from [appellee], nor does it obligate [appellee] to
accept orders for Work from [appellant], but it, together with any applicable
work order, shall control and govern all Work accepted by [appellee] and shall
define the rights and obligations of [appellant] and [appellee] during the term
hereof….

20.       AMENDMENT.  This Agreement cannot be amended on
behalf of [appellant], except by a document subscribed by [appellant’s]
chairman, president, a vice president or a properly empowered attorney-in-fact….


Finally, the MSA did not include a merger clause providing that
provisions of the MSA constituted the entire agreement.  See Ikon Office
Solutions, Inc. v. Eifert, 125 S.W.3d 113, 125–28 (Tex. App.—Houston [14th
Dist.] 2003, pet. denied) (addressing merger clause in a fraudulent inducement
case).

            Michael
“Mick” Francisco served as appellant’s operations manager in the fall of 2004. 
As appellant’s operations manager, Francisco’s duties included the design and
implementation of drilling plans for any wells for which appellant served as
the operator.  In addition, Francisco had the authority to engage contractors
to provide equipment and services for the wells drilled by appellant. 
According to Francisco, appellant had a short list of approved contractors and
when equipment or services were needed, he would solicit bids from those
contractors.

In the fall of 2004,
appellant was the operator of the Raynor #2 well in Brazoria County.  While
Francisco served as appellant’s operations manager, he was not physically
present at the Raynor #2 well on a daily basis.  Instead, appellant had a
representative at the well called the “company man.”  The company man was in
charge of the day-to-day operation of the drilling activities and, as a result,
he directed all activities of the various contractors at the well, including
appellee.  In addition, the company man served as Francisco’s eyes and ears at
the well.  On the Raynor #2 well, appellant’s company man was E. K. Adams.

The Raynor #2 well was a
deviated well, which means it was not drilled straight down.  Instead, it
started out straight, but eventually the well was turned and drilled at an
angle.  The Raynor #2 well eventually reached a depth of 14,570 feet.  The Raynor
#2 drilling operation eventually reached the stage where appellant needed
equipment and services provided by appellee and a small number of other approved
contractors.  Francisco requested bids and in response to that request, an
employee of appellee, Georgia Brogdon, sent appellant a series of written
proposals listing the equipment and services appellee would provide, as well as
the price appellee would charge.  Each of the proposals stated they were “made
subject to [appellee’s] published ‘Terms and Conditions’ applicable to goods
and/or services referred to herein.”  These “Terms and Conditions” were
consistent with those of other service providers and were published in
appellee’s catalog, and were also found on appellee’s delivery tickets,[1] field tickets,[2] and invoices.  The
field tickets set forth the following terms and conditions, among others:

Risk of Operations.  Customer agrees and
acknowledges that [appellee] is an independent contractor and that all [appellee]-furnished
rentals or services (“Work”) shall be under the direct supervision and control
of Customer; that because of uncertain or unknown conditions and incidental
hazards under which rental equipment is used and services rendered, [appellee]
does not warrant or guarantee the effectiveness of the materials used,
recommendations given or the services rendered or results of the Work; and that
all tools are run, equipment used, and services rendered at Customer’s sole
risk.  All tools and equipment (collectively “Tools”) rented hereunder are
rented and operated at Customer’s sole risk.  [APPELLEE] SHALL NOT BE LIABLE
FOR ANY DIRECT, SPECIAL, CONTINGENT, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL
DAMAGES ARISING FROM THE USE OF SUCH TOOLS OR EQUIPMENT.  Well conditions which
prevent satisfactory operation of such Tools do not relieve Customer of its
responsibilities for payment.  CUSTOMER SHALL BE SOLELY RESPONSIBLE FOR ANY
SUBSURFACE DAMAGE TO THE WELL OR RESERVOIRS OR FOR SURFACE DAMAGE TO PERSONS
(INCLUDING INJURY, ILLNESS AND DEATH) OR PROPERTY WHICH MAY RESULT FROM THE USE
OF SUCH TOOLS, INCLUDING DAMAGE CONSTITUTING OR RESULTING FROM POLLUTION
(IRRESPECTIVE OF THE CAUSE OF SUCH DAMAGE AND WHETHER OR NOT OCCASIONED BY
[APPELLEE’S] NEGLIGENCE, FAULT OR STRICT LIABILITY).  CUSTOMER SHALL DEFEND,
INDEMNIFY AND HOLD [APPELLEE] HARMLESS FROM ANY AND ALL CLAIMS, LAWSUITS,
LIABILITIES, AND CAUSES OF ACTION FOR INJURY OR ILLNESS TO OR DEATH OF ANY
PERSON OR FOR DAMAGE TO OR DESTRUCTION OF PROPERTY CAUSED BELOW OR ABOVE THE
SURFACE BY ANY TOOLS RENTED HEREUNDER, WHETHER OR NOT SUCH INJURY, ILLNESS,
DEATH, DAMAGE, OR DESTRUCTION IS CAUSED, IN WHOLE OR IN PART, BY THE
NEGLIGENCE, FAULT OR STRICT LIABILITY OF SMITH.

          After
receiving the solicited proposals, Francisco initially selected a contractor
other than appellee.  However, after a dispute erupted between appellant and
the initial contractor, in December 2004, appellant orally ordered the required
equipment and work from appellee.[3]

            Specifically,
appellant ordered the equipment and services used in a liner packer assembly. 
A liner packer assembly is a process used in the drilling industry to place
cement around the exterior of the drill pipe to prevent hydrocarbons from
travelling up the hole and causing blow-outs.  On the Raynor # 2 well,
Halliburton was the cement contractor while appellee was the contractor hired
by appellant to provide and install the liner packer assembly.  Appellee sent
Shelby Avant to install the liner packer assembly.  In theory, the process begins
with the rig drilling crew installing or “hanging” the liner down the hole.  If
all goes well, the liner will reach the bottom of the well hole.  After the
liner is installed, Halliburton would pump fifty barrels of cement down the
drill pipe.  To move the cement down the drill pipe and through the liner, two
pieces of equipment are used relevant to this appeal: a 3-inch dart and a
5-inch liner wiper plug.[4] 
 Once Halliburton had pumped the cement, Halliburton would instruct Avant to
drop the dart down the drill pipe and Halliburton would then begin pumping
drilling mud to force the dart down the drill pipe cleaning the cement out of
the pipe.  At the bottom of the drill pipe and the top of the liner, the dart
would then lock into the liner wiper plug[5]
which would be pushed down the liner by the drilling mud and it would push the
cement out of the bottom of the liner and back up the outside of the liner into
an area referred to as the annulus.  The combination of the dart and the liner
wiper plug would then seat at the bottom of the well and prevent the drilling
mud from mixing with the cement.[6] 
The crews working on the well would know the combined dart and liner wiper plug
had reached the bottom of the well and sealed it off when the pressure in the well
began to rise.[7] 
Once the cementing operation was complete, the drilling crew would release the
liner from the drill pipe and Avant would install the liner packer at the top
of the liner.  The reality ultimately worked out in a different way from the theory.

            Once
Francisco ordered the liner packer assembly from appellee, appellee had the
required equipment delivered to the Raynor #2 well.  Avant arrived sometime
after the equipment.  Upon his arrival, Avant reported to Adams and found
appellee’s field ticket already there in Adams’ office.  Avant inspected the
equipment and then, because the work on the well had not reached the point
where Avant was to install the liner packer assembly, he was instructed to
return to his car.  Avant ended up waiting for two days.

            The
delay was caused, at least in part, by appellant’s efforts to work a “wireline”
device down the hole.  A wireline is used by the drilling industry to determine
whether there are any obstructions in the well.  However, appellant’s efforts to
run the wireline only reached about 500 feet from the bottom of the well before
it ran up against “bridges” in the well.  A “bridge” is a spot inside the well
that prevents the equipment from moving straight down the hole and requires the
application of force to get through it.  Because the wireline had not been run all
the way to the bottom, there was no way for the operator to learn of potential
problems in those last 500 feet of the well.  

             
After appellant was unable to work the wireline completely to the bottom of the
well, Adams told Avant appellant was ready to begin installing appellee’s
equipment into the well.  Avant asked whether appellant was going to “make a
conditioning trip” before he proceeded.  A “conditioning trip” is a process of
cleaning solids out of the hole before running the liner to the bottom of the
well.  Avant was worried about installing the liner after the well had been
left for several days without circulating or conditioning, especially since
appellant had not been able to get the wireline to the bottom of the hole. 
Avant told Adams that the well should be conditioned because “there is a
possibility after this hole’s been down for four days we won’t get to bottom.” 
Adams replied, “[w]e’re going to run pipe.”

            Once
appellant made the decision to install the liner packer assembly without a
conditioning trip, Avant’s job was to supervise the drilling crew, controlled
by appellant, as they ran drill pipe down the well in an effort to set the
liner in the bottom of the hole.   However, according to Avant, the drilling
crew “hit numerous bridges in that last 500 foot [sic]” that caused him to
spend twice as long as he normally does to hang the liner in the well.  Avant testified
he “hit bridges and had to work — had to work my way through the last 500 foot
[sic] to get to the bottom….”  Ultimately, appellant decided to set weight on
the liner in order to get it to the bottom, a process referred to as “getting
rough with the liner.”  Getting rough with the liner can cause the liner wiper
plug to release early from the liner and travel down the hole.  If the liner
wiper plug did prematurely detach from the liner, the dart would not be able to
link up with it and form the required barrier at the bottom of the well.  It
was undisputed at trial that it was appellant’s decision, not Avant’s, to get
rough with the liner and the act of getting rough with the liner was carried
out by the drilling rig crew, not Avant.  During the effort to get the liner to
the bottom of the well, the liner became stuck in the hole, unable to move up
or down.  The drilling crew attempted to free the liner by attempting to
vigorously move it up and down, which can also result in the liner wiper plug
breaking away from the liner and traveling prematurely down the hole. 
Francisco conceded appellee played no role in getting the liner stuck in the
hole or the efforts to free it.  

            With
the liner stuck, appellant had to decide whether to fish the stuck liner out of
the well, or proceed to cement the liner in place down the hole.  Appellant
decided to go forward with the cementing operation.  In response to that
decision, Halliburton pumped fifty barrels of cement down the pipe.  After
pumping the cement, Halliburton instructed Avant to drop the dart at that time,
which he did.[8] 
Halliburton then began pumping drilling mud down the pipe to push the dart down
the hole.  The people at the well realized there was a problem down the hole
when the pressure began to rise before Halliburton had completed pumping the
full volume of drilling mud required to move the dart and the liner wiper plug
to the bottom of the well.  With cement still in the liner and possibly the
drilling pipe, appellant made the decision to release the liner from the drill
pipe, have appellee install the liner top packer, and then began to drill out
the cement in order to repair the well.[9] 


            Adams,
who also supervised the repair effort, testified that while they were drilling
out the cement, pieces of aluminum and rubber, were found “right at the bottom
of the well,” ahead of the cement.  The pieces of aluminum and rubber were all
that remained of the dart and liner wiper plug.  According to appellant, this
establishes the dart was released early, got ahead of the cement rather than
its proper position behind the cement, and hit the bottom of the well early.[10]  As a result,
appellant asserted two things allegedly happened.  First, the cement was not
forced out of the liner and up into the annulus.  Second, the cement and
drilling mud mixed together, preventing the cement from hardening.[11]  Appellee’s
expert, John Riseden, disagreed with appellant’s theory.  Riseden testified
that pieces of rubber and aluminum were actually found at two different levels
during the drilling out process which indicates the dart and liner wiper plug
never joined.[12] 
Riseden opined this occurred because either the process of getting rough with
the liner or the effort to get the liner unstuck caused the liner wiper plug to
detach from the liner early.

Riseden also opined on
what could cause the dart to get ahead of the cement when it was launched at
the correct time.   According to Riseden, the problem began with the dart
getting stuck in the drill pipe near the point where the well began to deviate
from the vertical, which was in close proximity to the top of the liner. 
Riseden testified this was the cause of the premature rise in the well’s
pressure, not the combined dart and liner wiper plug reaching the bottom of the
well early.  Riseden then explained the significance of appellant’s decision to
release the liner and set the liner top packer.  Riseden opined that the
process of releasing the liner from the drill pipe dislodged the dart.  Then, once
the tension on the drill pipe was released, dense cement was inside the liner
while outside the liner was lighter, less dense, drilling mud.  According to
Riseden, something called the “u-tube effect” seeks to achieve a balance
between the denser cement and the lighter drilling mud.  Riseden also explained
that the “u-tube effect” causes the cement inside the liner to fall, pushing the
dart down into the liner and also pushing some of the cement out of the liner
and up into the annulus.  Riseden testified the “u-tube effect” resulted in the
level of the cement inside the liner being pushed 300 feet down from the top of
the liner and the equivalent volume pushed outside the liner and up into the
annulus.  Finally, Riseden testified appellee’s personnel and equipment did not
cause the problems with the Raynor #2 cement job.

            Approximately
a month after the liner top packer was installed, pressure began migrating up
the well from the annulus, suggesting that the liner top packer was not
working.  Appellant initially attempted to purchase a replacement liner top
packer from appellee.  When appellee did not have one available, appellant
purchased the replacement from another vendor.  According to appellant,
appellee’s liner top packer failed at less than half its rated 7,500 pounds per
square inch of pressure.[13]

            A
dispute eventually erupted between appellant and appellee over the payment of
appellee’s invoices for work on the Raynor #2 and other wells.  When appellant
continued to refuse to pay the invoices, appellee filed suit against appellant
asserting claims for breach of contract and declaratory relief.  Appellant
filed a counterclaim against appellee seeking payment for the damages it
allegedly suffered when, according to appellant, (1) appellee improperly
installed the liner top packer assembly; and (2) appellee’s liner top packer
was defective.  Eventually the parties entered into an “Agreed Interlocutory
Judgment Respecting [Appellee’s] Contract Claims” (the “Agreed Judgment”).  In
this Agreed Judgment, which was signed by the trial court on April 23, 2008,
appellee was awarded $204,086.04 in damages as well as $50,000.00 in attorney’s
fees.  The Agreed Judgment did not address appellee’s claim for declaratory
relief, or appellant’s claims against appellee.  

            Following
entry of the Agreed Judgment, the primary issue remaining in the litigation was
what constituted the full contract that governed the equipment and services
provided by appellee.  The parties agreed their relationship was governed, at
least in part, by the MSA.  According to appellant, the MSA was the exclusive source
of the parties’ relationship.  Appellee on the other hand, asserted the MSA was
not exclusive, specifically contemplated subsequent terms, and was supplemented
by appellee’s Terms and Conditions that did not conflict with the MSA. 

Appellant moved for a
partial summary judgment on appellee’s only remaining cause of action: its
request for declaratory relief.  According to appellant, it was entitled to a
partial summary judgment because all of appellee’s “requested declarations must
fail as a matter of law because the [MSA] governs and controls the parties’
rights and obligations.”  Soon thereafter, appellee responded to appellant’s
motion for partial summary judgment and asked the trial court for a “summary
judgment in its favor that those provisions of its Terms and Conditions upon
which the MSA is silent became part of the parties’ agreement.”  The trial
court denied appellee’s motion.  As for appellant’s motion, the trial court
denied it in part and granted it in part.  Specifically, the trial court ruled
as follows:

            The Court FINDS that the parties are bound by
the [MSA] …, and that the [MSA] governs and controls the parties’ rights and obligations
as per Paragraph (1) of the [MSA];

            The Court FINDS that the [MSA] is not a final
and complete expression of the parties’ agreement.  Specifically, the Court
finds that Paragraph (17) of the [MSA] contemplated that subsequent agreements,
to the extent they are not inconsistent with the [MSA], constitute the parties’
agreement;

            The Court FINDS that subsequent agreements do
not constitute an amendment to the [MSA] (according to Paragraph (20) of the
[MSA]) to the extent that are not inconsistent with Paragraph (17) of the
[MSA]; and

            The Court FINDS that [appellee] expressly bound
itself in Paragraph (2) of the [MSA] to perform in a good and workmanlike
manner.

            IT IS ORDERED that nothing contained in this
Order shall be construed as an adjudication on the issues of whether
[appellee’s] “Terms and Conditions” as set forth in its shipping tickets,
invoices, and price book are part of the parties’ agreement, nor whether these
“Terms and Conditions” satisfy the fair notice requirement, as required by law.

            The
parties then went to trial on all remaining issues.  At the close of the
evidence, the trial court submitted the case to the jury in a charge consisting
of ten questions.  We need only mention six.

In Question 1, the jury
was asked whether appellee had failed to comply with the MSA.  The jury
answered “no.”

In Question 2, the jury
was asked if appellee had failed “to perform services in a good and workmanlike
manner, and, if so, was such failure a proximate cause of the occurrence or
damage to the Raynor No. 2 Well in question?”  The jury again answered “no.”

In Question 3, the jury
was asked: “[d]o you find that the parties’ July 3, 2003 [MSA] between
[appellant] and [appellee], along with any oral or written work order used by
[appellant], controls and governs the work performed by [appellee] for
[appellant] on the Raynor #2 Well?”[14] 
The jury answered “yes.”

In Question 4, the jury
was asked whether Adams had “authority from [appellant] to accept [appellee’s]
performance and any terms and conditions relating to the performance?”  The
jury answered “no.”

In Question 5, the jury
was asked:

            Did [appellee] and [appellant] agree that their
respective rights and obligations referable to the WMPO packer assembly would
be governed by the “Terms and Conditions” stated in any of the following [of
appellee’s] documents: a) Catalog, including Price Lists and Price Book; b) Job
and Delivery Tickets; or c) Invoices?

            In deciding whether the parties reached an
agreement, you may consider what they said and did in light of the surrounding
circumstances, including any earlier course of dealing, trade custom, or course
of performance.  In deciding whether the parties reached an agreement, you may
not consider the parties’ unexpressed thoughts or intentions.[15]

The jury
answered “yes.”

Finally, in Question 6,
a question predicated on a “yes” answer to either Questions 4 or 5, the jury
was asked whether appellant had failed to comply with the appellee’s terms and
conditions.  The jury answered “no.”[16]

            Based
on the jury’s answers, the trial court entered judgment in favor of appellee in
the same amount included in the parties’ “Agreed Interlocutory Judgment:”
$204,086.04, plus $84,240.01 in pre-judgment interest, and attorney’s fees in
the amount of $50,000.00.  This appeal followed.

Discussion

            Appellant presents
two issues.   We address each in turn.

 

 

I.         Did appellant
preserve error on its first issue?

Appellant’s first issue has two parts.  Initially,
appellant asserts the trial court erred when, in ruling on appellant’s motion
for partial summary judgment, it determined the MSA was not a final agreement
and thereby denied appellant’s motion.  The second part of appellant’s first
issue then builds on the first.  Appellant contends that, based on the trial
court’s erroneous ruling on appellant’s motion for partial summary judgment,
appellee’s Terms and Conditions were admitted into evidence and the admission
of this probably resulted in the rendition of an improper judgment.  Appellant
then concludes its first issue by asserting this Court “should reverse the
trial court’s ruling on the Cross-Motions for Summary Judgment, hold that the
[appellee’s Terms and Conditions] are not part of the agreement, and remand the
case to be tried with the instruction that the MSA exclusively controls.” In
response, appellee argues first that appellant is improperly trying to appeal
from the denial of its motion for partial summary judgment.  Appellee then contends
that any objections appellant might have had to the admission of the Terms and
Conditions into evidence were waived when appellant (1) offered documents
containing the Terms and Conditions into evidence; and (2) failed to object
when appellee offered documents containing the Terms and Conditions into
evidence.  We agree with appellee.

Generally speaking, the denial of a motion for
summary judgment is not appealable.  United Parcel Service, Inc. v. Cengis
Tasdemiroglu, 25 S.W.3d 914, 916 (Tex. App.—Houston [14th Dist.] 2000, pet.
denied) (citing Cincinnati Life Ins. v. Cates, 927 S.W.2d 623, 625 (Tex.
1996)).  In addition, when a motion for summary judgment is denied by the trial
judge and the case is tried on the merits, the order denying the summary
judgment cannot be reviewed on appeal.  Id.  In that case, the parties’
remedy is to assign error to the trial court’s judgment ultimately rendered
following trial on the merits.  Id.

To avoid the application of the general rule,
appellant cites cases holding that when both parties move for summary judgment
and the trial court grants one motion and denies the other, the appellate court
reviews both motions and renders the judgment the trial court should have
rendered.  See e.g. Commissioners Court of Titus County v. Agan, 940
S.W.2d 77, 81 (Tex. 1997).  However, for this exception to the general rule to
apply, both parties must have sought final judgment relief in their cross-motions
for summary judgment.  CU Lloyd’s of Texas v. Feldman, 977 S.W.2d 568,
569 (Tex. 1998) (per curiam).  Because both parties moved only for partial
summary judgments and the case was then tried on the merits, we hold the
exception to the general rule does not apply and appellant may not appeal the
denial of its motion for partial summary judgment.  United Parcel Service,
Inc., 25 S.W.3d at 916.  

We turn now to the second part of appellant’s first
issue contending the trial court erred when it admitted evidence related to
appellee’s Terms and Conditions.  To preserve error for appellate review, the
Texas Rules of Appellate Procedure require parties to make timely and specific
objections at the earliest possible opportunity to preserve complaints that relate
to a trial court’s admission of evidence.  Perez v. Spring Branch Indep.
Sch. Dist., No. 14-10-00058-CV, 2011 WL 742601, at *1 (Tex. App.—Houston
[14th Dist.] March 3, 2011, no pet.) (mem. op.).  The complaining party waives
error in the admission of evidence if it allows the evidence to be introduced
during trial without objection.  Id. (citing Bay Area Healthcare
Group, Ltd. v. McShane, 239 S.W.3d 231, 235 (Tex. 2007)).  In addition,
“[a] party on appeal should not be heard to complain of the admission of
improper evidence offered by the other side, when he, himself, introduced the
same evidence or evidence of a similar character.”  McInnes v. Yamaha Motor
Corp., U.S.A., 673 S.W.2d 185, 188 (Tex. 1984).  Because appellant was the
first party to offer evidence of the Terms and Conditions and did not object
when appellee offered the Terms and Conditions into evidence, we hold appellant
waived the error, if any, by the trial court in admitting evidence of
appellee’s Terms and Conditions.

Having addressed and rejected each argument raised,
we overrule appellant’s first issue.

II.        Is
the evidence factually sufficient to support the judgment?

In the second issue, appellant contends the evidence
is factually insufficient to support the jury’s negative answers to Questions 1
and 2 of the Jury Charge; questions on which it had the burden of proof. 
Appellant also asserts the evidence is factually insufficient to support the
jury’s positive answer to Question 5 of the Jury Charge.

A.        The standard of review.

In reviewing the factual sufficiency of the evidence,
we must examine the entire record, considering both the evidence in favor of,
and contrary to, the challenged findings.  See Maritime Overseas Corp. v.
Ellis, 971 S.W.2d 402, 406–07 (Tex. 1998); Cain v. Bain, 709 S.W.2d
175, 176 (Tex. 1986).  When a party challenges the factual sufficiency of the
evidence supporting a finding for which it did not have the burden of proof, we
may set aside the verdict only if it is so contrary to the overwhelming weight
of the evidence as to be clearly wrong and unjust.  See Ellis, 971
S.W.2d at 407; Nip v. Checkpoint Systems, Inc., 154 S.W.3d 767, 769
(Tex. App.—Houston [14th Dist.] 2004, no pet.).  When a party attacks the
factual sufficiency of an adverse finding on which it had the burden of proof,
it must demonstrate on appeal that the adverse finding is against the great
weight and preponderance of the evidence.  Dow Chem. Co. v. Francis, 46
S.W.3d 237, 242 (Tex. 2001).  The amount of evidence necessary to affirm is far
less than the amount necessary to reverse a judgment.  GTE Mobilnet of S.
Tex. v. Pascouet, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001,
pet. denied).  We are not a factfinder.  Ellis, 971 S.W.2d at 407. 
Accordingly, we may not pass upon the witnesses’ credibility or substitute our
judgment for that of the jury, even if the evidence would support a different
result.  Id.  If we determine the evidence is factually insufficient, we
must detail the evidence relevant to the issue and state in what regard the
contrary evidence greatly outweighs the evidence in support of the verdict; we
need not do so when affirming a jury’s verdict.  Gonzalez v. McAllen Med.
Ctr., Inc., 195 S.W.3d 680, 681 (Tex. 2006) (per curiam).

B.        The evidence is sufficient to support
the jury’s answers to Questions 1 and 2.

In Question 1, the jury was asked whether appellee
had failed to comply with the MSA by providing defective equipment or services. 
In Question 2, the jury was asked if appellee had breached the warranty of good
and workmanlike performance.  The jury answered both questions “no.”  Appellant
asserts the evidence is factually insufficient to support these answers because,
it argues, appellee’s deficient equipment and/or services resulted in the
failed cement job and the installation of a defective liner top packer.

In support of its contention that appellee was
responsible for the bad cement job, appellant initially points to the following
undisputed evidence: (1) appellee provided the equipment at issue as well as
the personnel to install it in appellant’s well; (2) pieces of aluminum and
rubber were discovered in the well returns while the cement was being drilled
out; and (3) the intended location of the dart and liner wiper plug is behind
the cement.

Appellant also emphasizes evidence that was
contested.  This evidence includes the depth where the pieces of aluminum and
rubber were found in the well.  Appellant contends the pieces were found in a
single location and asserts this establishes that the dart preceded the cement
down the drill pipe, joined with the liner wiper plug, and they travelled down
the liner together, where they sealed the well in front of the cement.  In
support of this argument, appellant cites only the testimony of Robert Olman, a
former project manager for appellee.  However, in the cited testimony, Olman
testified only that the dart and liner wiper plug were “well below the cement,
well down into the 5-inch production liner.”   Appellant also argues the “jury
heard testimony from [appellant’s] expert,[17]
Halliburton’s representative at the Well, and the company man on site,[18] who all opined
that [appellee’s] pump down plug was released early by [appellee] causing it to
get ahead of the cement.”  Here, appellant begins with the opinion testimony of
Francisco, a person who was not present at the Raynor #2 well when the dart was
dropped.[19] 
Next, appellant cites the testimony of James Kellum, one of Halliburton’s people
at the well.  However, Kellum’s testimony was limited to the fact that the
pressure began to rise in the well before all of the drilling mud had been
pumped.  Appellant’s brief also ignores Kellum’s testimony that he was assuming
the rise in pressure was the result of the plug arriving at the bottom of the
well early.  Finally, appellant references some of Adams’ testimony,
specifically “[t]here’s no earthly way that [the dart and liner wiper plug]
could get there, no other explanation other than it went before the cement.”  

Appellant’s argument also ignores much evidence in
the record that is contrary to its position.  This includes the testimony of
every eyewitness that Avant dropped the dart at the right time.  Appellant
offered no direct evidence to overcome this testimony.  Appellant also failed
to address the fact Adams, appellant’s company man on the well, testified that
he had no complaint with Avant’s performance on the Raynor #2 well.  Appellant’s
argument also avoids any mention of the testimony of Olman, Avant, and Riseden
that the problems appellant encountered with the well, coupled with appellant’s
decisions on how to handle those problems, could have independently caused the
failure of the cement job.  Appellant’s argument also completely ignores
Riseden’s expert testimony explaining in detail how the cement failure could
have occurred even if Avant had dropped the dart at the proper time.  Finally,
appellant’s argument overlooks the fact that Avant, a man with more than forty
years’ experience working on oil and gas wells, testified that it is possible
to do everything right and still not have a good cement job.

With respect to its contention that appellee provided
a defective liner top packer, appellant points only to Francisco’s testimony
that the liner top packer was rated to withstand up to 7,500 pounds per square
inch of pressure (“psi”) and it failed about a month after it was installed at
approximately 3,786 psi.  According to appellant, this evidence establishes the
jury’s answers to Questions 1 and 2 are not supported by factually sufficient
evidence.

In making this assertion, appellant once again
overlooks contrary evidence in the record.  First, appellant fails to mention
Avant’s testimony that he properly installed the liner top packer and Adams’
testimony that he had no complaints about Avant’s performance on the Raynor #2
well.  Appellant’s argument also ignores the fact that the liner top packer was
a light-duty packer, which means it was designed for the limited purpose of
temporarily sealing the well to prevent gas from migrating up the hole.  In
addition, while it is true the packer at issue here was rate-tested to
withstand 7,500 psi in a laboratory, appellee’s expert testified that only
permanent packers publish an actual working pressure.  Also, Olman testified
that appellee tested the liner top packer at issue here on the surface at up to
7,500 psi, but at 350 degrees, the maximum temperature the packer was rated to
withstand.  Olman also testified that at temperatures above 350 degrees, the
liner top packer at issue here will get brittle and eventually break apart. 
Finally, there was evidence that the temperature in the well was 370 degrees.  We
conclude the jury could have reasonably inferred from this evidence that well
conditions beyond appellee’s control and beyond the liner top packer’s rated
capacity, caused the packer to become brittle and caused it to fail. 

While appellant may argue appellee breached the MSA
and the warranty of good and workmanlike performance, the jury, after hearing
all of the evidence, determined otherwise.  We conclude there is abundant
evidence to support the jury’s answers to both questions.  Because the jury’s
answers to Questions 1 and 2 are not against the great weight and preponderance
of the evidence, we hold the evidence is factually sufficient.

C.        Factually sufficient evidence supports
the jury’s answer to Question 5.

As previously mentioned, the jury was asked in
Question 5 whether appellee’s Terms and Conditions became part of the parties’
agreement and the jury found that they did.  In the second half of their second
issue, appellant asserts the evidence is factually insufficient to support this
answer.  In making this argument, appellant overlooks two impediments.  First,
this Court must review the sufficiency of the evidence against the charge as
submitted, not against some other legal standard.  See Osterberg v. Peca,
12 S.W.3d 31, 55 (Tex. 2000) (“[I]t is the court’s charge, not some other
unidentified law, that measures the sufficiency of the evidence when the
opposing party fails to object to the charge.”)  Second, appellant once again
ignores the evidence contrary to its position.

Here, appellant begins with the proposition that the
MSA exclusively controlled the parties’ relationship and then it asks this
Court to determine whether the evidence satisfied those terms.  According to
appellant’s argument, there are only two ways appellee’s Terms and Conditions
could have become part of the parties’ agreement: (1) if they were found in a
work order issued by appellant; or (2) if they were included in an amendment or
modification to the MSA approved by persons specified in paragraph 20 of the
MSA.  Appellant then asserts there was factually insufficient evidence to
establish either method.   While appellant may make this argument, this was not
the legal standard in the jury question submitted.  Instead, the jury was asked
whether the parties agreed “that their respective rights and obligations …
would be governed by the “Terms and Conditions” stated in any of the following
documents: a) Catalog, including Price Lists and Price Book; b) Job and
Delivery Tickets; or c) Invoices?”  The jury was then instructed: “[i]n
deciding whether the parties reached an agreement, you may consider what they
said and did in light of the surrounding circumstances, including any earlier
course of dealing, trade custom, or course of performance.  In deciding whether
the parties reached an agreement, you may not consider the parties’ unexpressed
thoughts or intentions.”  Appellant’s only objection to this question and
instruction was that the final sentence of the instruction should not be
included.[20] 
Since appellant did not lodge any other objection to the submission of the
question, we review the sufficiency of the evidence based on the question
actually submitted to the jury.

The evidence relevant to Question 5 comes primarily
from appellant’s own witness: Francisco.  Francisco testified he was hired by William
H. Davis[21]
himself to act as appellant’s operations manager in charge of appellant’s
Raynor #2 well and that Davis had delegated contractual authority to him. 
Francisco admitted he was an attorney in fact for appellant with the authority to
sign master service agreements and to negotiate contracts for appellant.  The
evidence also reveals that it was Francisco who signed the MSA at issue here
for appellant.  In addition, Francisco testified he solicited bids from various
vendors for the goods and services at issue in this litigation.  He also
testified that, in response to that request, appellee submitted proposals,
which included the proviso that they were made subject to appellee’s published
Terms and Conditions.  Francisco acknowledged he had access to appellee’s
catalog and that the catalog contained appellee’s Terms and Conditions.  Francisco
testified that after he received appellee’s proposals, he ordered appellee’s
goods and services through a telephone call.  Francisco also acknowledged he
was aware that appellee’s Terms and Conditions were printed on appellee’s
invoices, field tickets, and job tickets.  Finally, Francisco testified that he
never objected to appellee’s Terms and Conditions.  We conclude this testimony constitutes
factually sufficient evidence to support the jury’s affirmative answer to
Question 5.

Having determined there is factually sufficient
evidence supporting the jury’s answers to Questions 1, 2, and 5, we overrule
appellant’s second issue on appeal.

 

Conclusion

            Having
overruled each of appellant’s issues on appeal, we affirm the trial court’s
final judgment.

        

 

                                                                                    

                                                                        /s/        John
S. Anderson

                                                                                    Justice

 

 

 

 

 

 

Panel consists of Justices
Anderson, Seymore, and McCally.

 









[1] Delivery tickets, as the
name implies, were signed when appellee delivered the equipment to the well
site.





[2] Field tickets were signed
by the operator when appellee installed the equipment or completed the
contracted services.





[3] In addition to the
equipment and services provided by appellee to appellant on the Raynor #2 well,
appellee also provided equipment and services on other wells.





[4] The diameter of the drill
pipe is smaller than the diameter of the liner, thus the need for two devices.





[5] The liner wiper plug is
suspended at the top of the liner by brass pins.  The liner wiper plug is
hollow in the middle, much like a doughnut, which permits the drilling mud,
spacer, and cement to pass through it until it links with the dart.





[6] If the drilling mud mixes
with the cement, it will prevent the cement from properly setting.





[7] In addition, because the
size of the well hole was a known factor, appellant, appellee, and Halliburton
knew the volume of drilling mud required to push the dart and liner wiper plug
completely down to the bottom.





[8] Several eyewitnesses,
including both Avant and Adams, testified Avant launched the dart at the proper
time.  One Halliburton eyewitness testified he did not recall any specifics of
this particular drilling operation but he would probably have remembered if
anything out of the ordinary, such as launching the dart early, had occurred.





[9] Avant testified he
installed the liner top packer properly.





[10] Appellant’s theory of
how this happened was either (1) despite the eyewitness testimony, Avant
launched the dart early, or; (2) the machine used to launch the dart
malfunctioned and released the dart early.  Appellant’s theory continues by
asserting that the dart moved down the drill pipe, latched into the liner wiper
plug and together they moved to and sealed the bottom of the well, which
explains the early rise in the well pressure. 





[11] The evidence as to
whether any cement travelled out of the liner and up into the annulus where it
hardened was disputed.  Appellee’s expert testified that the cement bond log
from the well site indicates significant amounts of cement travelled out of the
liner and up into the annulus, where it hardened.





[12] According to Riseden,
none of the rubber and aluminum was found at the very bottom of the well.  The lowest
pieces were approximately 60 feet from the bottom of the well.





[13] The liner top packer
installed by appellee was a temporary liner top packer that had been tested on
the surface under optimal conditions to withstand 7,500 pounds per square inch
of pressure at up to 350 degrees.  The evidence at trial indicated the temperature
in the well was approximately 370 degrees.





[14] In Question 3, the jury
was instructed: “You must decide its meaning by determining the intent of the
parties at the time of the agreement.  Consider all the facts and circumstances
surrounding the making of the agreement, the interpretation placed on the
agreement by the parties, and the conduct of the parties.”  The source of this
instruction is “PJC 101.8 Instruction on Ambiguous Provisions.”





[15] Appellant lodged only
two objections during the charge conference.  Only one is relevant to this
appeal; an objection to part of Question 5.  Specifically, appellant objected
only that the trial court should not include the final sentence in the
instruction accompanying Question 5.  The source of this instruction is “PJC
101.3 Instruction on the Formation of Agreement.”





[16] Questions 7 through 10
were all predicated on “yes” answers to questions the jury answered “no” to, so
they were left blank by the jury.





[17] Francisco.





[18] Adams.





[19] Specifically, Francisco
testified: “There is only one way it could happen and that is for the dart
latching into the wiper plug in front of the cement and the only way the dart
could have gotten to the wiper plug before the cement was if the dart was
allowed either through a mechanical failure of [appellee’s] interval equipment
or the operational failure of [appellee’s] liner hand for that dart to be in
front of the cement.”





[20] In making this
objection, appellant argued the jury should be allowed to consider a party’s
unexpressed thoughts or intentions because, according to appellant, the jury
had heard evidence of this nature.





[21] William H. Davis is the
president of appellant.